MSG

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**19    2656**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _5611 Chew Ave. Phila. PA 19138_

Address of Defendant: ~~_____~~ _Einstein Medical Center 5501 Old York Rd_

Place of Accident, Incident or Transaction: _Einstein Med. Cntr.        Phila. PA_

THIS CASE IS RELATED TO:   _12 - 1451_

Date Terminated: _____

CIVIL ACTION NO.  _19 - 2656_
CRIMINAL NO. _____

ASSIGNED TO:  _Judge Goldberg_

| | Yes | No |
|---|---|---|
| ...e year | ☐ | ☑ |
| ...ior suit | ☐ | ☑ |
| ...ier | ☐ | ☑ |
| ...rights | ☐ | ☑ |

pending or within one year previously terminated action in

DATE: _6-18-19_    _Michael Wiggins_    _____
                   *Attorney-at-Law / Pro Se Plaintiff*        *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.**    *Federal Question Cases:*

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Patent
- ☐ 6. Labor-Management Relations
- ☑ 7. Civil Rights
- ☐ 8. Habeas Corpus
- ☐ 9. Securities Act(s) Cases
- ☐ 10. Social Security Review Cases
- ☐ 11. All other Federal Question Cases
       *(Please specify):* _____

**B.**    *Diversity Jurisdiction Cases:*

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify):* _____
- ☐ 7. Products Liability
- ☐ 8. Products Liability – Asbestos
- ☐ 9. All other Diversity Cases
       *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _Michael Wiggins_ , counsel of record *or pro se plaintiff*, do hereby certify:

- ☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

- ☐ Relief other than monetary damages is sought.

DATE: _6 -18-19_    _Michael Wiggins_    _____
                    *Attorney-at-Law / Pro Se Plaintiff*        *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

MSG

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## CASE MANAGEMENT TRACK DESIGNATION FORM

*Michael Wiggins*

v.

*Einstein Med. Cntr.*

:
:
:
:
:

CIVIL ACTION

NO. **19    2656**

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

## SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.      ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
and Human Services denying plaintiff Social Security Benefits.      ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.  ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
exposure to asbestos.      ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
commonly referred to as complex and that need special or intense management by
the court. (See reverse side of this form for a detailed explanation of special
management cases.)      ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.      (✗)

6-18-19

**Date**

*[signature]*

**Attorney-at-law**                **Attorney for**

**Telephone**                **FAX Number**                **E-Mail Address**

(Civ. 660) 10/02

MSG

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MICHAEL WIGGINS,

      Plaintiff

vs.

EINSTEIN HOSPITAL,

      Defendant

and

MARK WILHELM, Director of Security,
LOREN MARGOTT, Human Resources,
and CARLA BRYANT, Employee
Relations,

      Defendants

<u>Count 1</u>

Unlawful Retaliation under Title VII

<u>Count 2</u>

Breach of Promissory Estoppel/Detrimental
Reliance

<u>Count 3</u>

Breach of Implied Contract

Civil Action No.   **19      2656**

## **INTRODUCTION**

Plaintiff worked for Einstein Medical Center ("Einstein" or "Defendant") as a

Protection Officer from 4-4-16 through 3-6-18 until being terminated from his position for

complaining of discrimination.  Plaintiff through legitimate factual support including disciplinary

write ups, determinations from Human Resources ("HR"), and Employee Relations, will

demonstrate that the defendant unlawfully retaliated against him for filing a formal complaint of

discrimination with HR.

Plaintiff also rebuts the at-will presumption proving that defendant had entered

into an implied contract with plaintiff, and then terminated him without just cause.

1

# COMPLAINT

## Count 1

## Plaintiff Is A Victim Of Unlawful Retaliation

1.    Plaintiff is clearly able to establish a *prima facie* case of unlawful retaliation, which consists of the following elements: (1) The plaintiff engaged in the protected activity. (2) Thereafter, the defendant took an adverse action against the plaintiff. (3) There was a causal link between the protected activity and the adverse employment action. Abrahamson v. William Paterson Coll. of New Jersey, 260 F.3d 265 (3d Cir.2001).

2.    Plaintiff, on 8-17-17, engaged in the protected activity by filing a formal complaint of Racial Discrimination with Human Resources against certain members of the Department whom Plaintiff had learned were going behind his back and making disparaging remarks about him to management.  It is Plaintiff's good faith belief that his ethnicity was the motivating factor in them doing so. *See* HR's response to plaintiff's Discrimination Complaint attached as **Exhibit A**.

A. The Planning of Unlawful Retaliation

3.    Director of Security, Mark Wilhelm on 8-23-17, just 6 days after Plaintiff's complaint of discrimination, received an employee's complaint alleging that plaintiff was rude to a visitor.  Wilhelm, instead of addressing the employee's complaint at the time it was made, held onto the employee complaint for complaint for a month-and-a half, until 10-5-17, for the sole purpose and intent of setting plaintiff up. Abrahamson, 260 F.3d 265 (3d Cir.2001).

4.    Defendant, because the employee complaint of 8-23-17 was not sufficient to justify skipping a level of progressive discipline, waited for something else trivial to occur,

2

and then combined incidents. Defendant then used this combination to justify skipping a level of progressive discipline to accelerate the unlawful termination of plaintiff's employment. Id.

5.      Thus, the *planning* of unlawful retaliation occurred on 8-23-17, just 6 days after the protected activity. "Collecting cases finding unduly suggestive temporal proximity ranges from two days to three weeks." Lichtenstein v. Univ. of Pittsburgh Med. Ctr,. 691 F.3d 294, 307 (3d Cir. 2012).

B.  Defendant Skipped a Level of Progressive Discipline to Terminate Plaintiff.

6.      Plaintiff, in his protected activity, complained about how Director of Security Mark Wilhelm handled the discrimination. Plaintiff then subsequently contested Human Resource's, Loren Margott, who received and investigated plaintiff's Complaint. Plaintiff cited Margott's incorrect application of the Employee Handbook. Id.

7.      Plaintiff, shortly thereafter, received a Third Step Disciplinary Action of 10-5-17, in which both Wilhelm and Margott skipped over the Second level of progressive discipline to set Plaintiff up for the unlawful termination. Id.

8.      The Third Step Action of 10-5-17 incorporates the aforementioned employee complaint of 8-23-17. Id.

9.      Plaintiff, prior to filing his internal complaint of discrimination with HR, had only a First Step action of discipline in his employment file. Plaintiff, after filing his complaint of discrimination subsequently received a Third Step action. Therefore, the temporal proximity of a month-and-a half between Plaintiff's protected activity and the adverse employment action (8-17-17 to 10-5-17), must be *divided by two* since the defendant *combined two levels of discipline into one action*. Thus, the temporal proximity between Plaintiff's

protected activity and the adverse employment action must be construed as just 3 weeks and sufficient to establish temporal proximity.  Lichtenstein, 691 F.3d 294, 307 (3d Cir. 2012).

10.    Therefore, regardless of what reasoning the Honorable Court applies, whether it is the planning of unlawful retaliation that occurred just 6 days after the protected activity, or the execution of the plan a month-and-a half later in which defendant combined two levels of progressive discipline into one action, and therefore the established time frame must be divided be two, or both, plaintiff is able to establish unduly suggestive temporal proximity between the protected activity and the adverse employment action. "Whether a causal connection exists must be considered with a careful eye to the specific circumstances encountered."  Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 n.5 (3rd Cir. 2000).

**Plaintiff Was Repeatedly Antagonized By Defendant Following The Protected Activity.**

11.    To demonstrate a causal connection, a plaintiff must show "either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259,267 (3rd Cir. 2007).

12.    Plaintiff, in addition to timing, establishes a clear pattern of antagonism following the protected activity. Id.

13.    Plaintiff, following the protected activity, was subjected to unusually close supervision and written up for trivial matters.  Plaintiff, in addition, received disciplinary actions in which he committed absolutely no violation whatsoever. Id.

14.    For example, the aforementioned Third Step Action (or "Decision Making Day") of 10-5-17 states "Specifically, on two (2) separate occasions you were doing non-work related activities while on duty causing an unsafe and unwelcoming environment to staff,

patients and visitors." This vague, ambiguous write-up gives no details as to what the "two

separate occasions" are. *See* Third Step Action ("DMD") attached as **Exhibit B.**

15.    Plaintiff, however on 2-2-18, aggrieved the Decision Making Day before

Employee Relations, Carla Bryant, and it was at the Appeal Hearing that the specific details

about the disciplinary action were revealed.

## EMPLOYEE RELATIONS' CARLA BRYANT SUPPORTED AND CONDONED DEFENDANT'S UNLAWFUL RETALIATION

16.    Among the issues discussed at the Appeal Hearing for the Third Step

Action of 10-5-17 was the aforementioned allegation of 8-23-17 alleging that Plaintiff was rude

to a visitor. Ms. Bryant supported the bogus claim.

17.    While posted in Moss lobby a patient approached the security desk to

inquire about the whereabouts of the Moss registration desk. Ms. Bryant's Determination

regarding this interaction is proven false based on the following:

A) According to Ms. Bryant's Determination the conversation went as follows after

   the visitor inquires as to the whereabouts of the registration staff:

   Visitor:    Where's the registration staff?
   Plaintiff:  The staff went to lunch.
   Visitor:    Where did they all go?
   Plaintiff:  Well everybody gotta eat.

   This makes no sense. A person would not ask "where did they all go?" after they

   were already informed that "staff went to lunch." Furthermore, the alleged

   conversation does not reflect a reasonable order of dialogue between two people.

   This is what was actually said when the visitor inquired as to the whereabouts of

   the Moss registration staff:

Visitor:   Where's the registration staff?

Plaintiff:  The staff went to lunch.

Visitor:   Well they shouldn't be at lunch when people gotta be seen (in a rude voice).

Plaintiff:  Well we all have to eat, but you can......

What plaintiff was attempting to say was "but you can go to room 134 and they will register you there." Plaintiff was totally willing to assist this visitor. However, the woman walked away as plaintiff was speaking to her saying something else rude and unintelligible. The visitor was, in fact, rude to plaintiff.

B)  Ms. Bryant further supported the false claim by saying "he (Wilhelm) confirmed the witness's account of this incident by reviewing surveillance video of the interaction." Ms. Bryant knew, or should have known that Wilhelm cannot corroborate a *verbal conversation* using video surveillance that does not record sound.

C)  Wilhelm received the employees' email complaint about plaintiff's interaction with the visitor on 8-23-17, yet did not address the incident until a month-and-a half later on 10-5-17 when he generated the Third Step Action. Wilhelm, as Director of Security, should have taken immediate remedial action had he believed that plaintiff was, in fact, rude to a visitor. Yet, he did not.

18.     Employee Relations Carla Bryant despite the peculiarities, and clear lack of credibility of  both the employee complaint, as well as the write up, supported the bogus claim anyway stating "I also believe you were inappropriate in the manner in which you spoke with the patient." *See* Bryant Determination at page 1, ¶ 3 attached as **Exhibit C**.

6

19.     Significantly, Plaintiff simply saying "Well we all have to eat" to a visitor who is angry that the registration staff is at lunch is trivial and does not warrant disciplinary action - let alone skipping an entire level of progressive discipline. "A pattern of antagonism is established when an employee is subject to "[r]epeated violations for trivial matters and unusually close supervision" following protected action, Young v. J.B. Hunt Transport, Inc, No. 11-5518, 2013 WL 526814, at *4(E.D. Pa. Feb 13, 2013).

20.     A causal link may be established by "the circumstances as whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse employment action." Daniels v. Sch. Dist. Of Phila., 776 F.3d 181, 193 (3rd Cir. 2015)."

21.     Ms. Bryant further supported and condoned defendant's antagonism of plaintiff by deliberately misrepresenting hospital policy to benefit management. Ms. Bryant supported defendant skipping a level of progressive discipline by selectively citing only a portion of the policy. Id.

22.     For example, Ms. Bryant in her Determination states "However, as I stated during our meeting, Einstein's performance Accountability Policy: HR133.1 (Section B page 6) provides that while Einstein's policy is intended to be progressive, managers have discretion to initiate any step in the formal alignment process." However, Ms. Bryant does not quote the *entire* section. Ms. Bryant deliberately and selectively left out the part of the policy that also says that this discretion is "based on the *previous communications* with the employee and/or the *severity of the situation*." Ms. Bryant knowingly and willingly misrepresented hospital policy to assist

7

Wilhelm and Margott in setting plaintiff up for the unlawful discharge. *See* Bryant

Determination at Page 2, ¶ 4, Lines 3-6 attached as **Exhibit C.**

      23.    This was the first time during plaintiff's entire tenure with Einstein,

despite dealing with hundreds of visitors, that a complaint had been levied against him regarding

his customer service of visitors. Therefore, there was no "previous communications" nor was

there any "severity of the situation" that would justify defendant skipping a level of progressive

discipline. *See* Policy and Procedure Manual at page 6, letter f, ¶ 3 attached as **Exhibit D.**

      24.    "The intervening antagonism" and the "other evidence suggesting that the

employer had a retaliatory animus when taking the adverse employment action", in this instance,

is established in that defendant, who without citing any form of gross misconduct, skipped a

level of progressive discipline, immediately following the protected activity, and then tried to

justify it by deliberately misrepresenting hospital policy. Daniels, 776 F.3d 181, 193 (3rd Cir

2015)."

As to Plaintiff's Computer Usage

      25.    The second part of the disciplinary action of 10-5-17 addresses plaintiff's

computer usage. Plaintiff was subjected to unusually close supervision, by defendant, regarding

his computer usage. Other employees within the Department were allowed to freely use the

computer without scrutiny or consequence. Unauthorized computer usage is the most common

infraction within the Department, and it occurs on a daily basis, and on all three shifts. It is an

accepted employment practice that must and be construed by the court as a "trivial matter."

Young, No. 11-5518, 2013 WL 526814, at *4(E.D. Pa. Feb 13, 2013).

      26.    Ms. Bryant, in her Determination, goes into great detail regarding

plaintiff's computer usage, yet failed and refused to investigate Plaintiff's claim that the

overwhelming majority of the Department also uses the computer for personal use ranging from games, to Facebook, sports, shopping, ect. *See* Appeal Hearing affidavit attached as **Exhibit E**.

27.     Human Resources' Loren Margott, who received and investigated plaintiff's complaint of Discrimination, was present during the meeting when Wilhelm gave plaintiff the Third Step Action of 10-5-17 as well as the subsequent Appeal Hearing before Carla Bryant. Margott supported and condoned Wilhelm's unlawful employment action. Margott acknowledged at the Hearing to "threatening" plaintiff with a review of his computer usage at Wilhelm's request. Also, Margott, like Wilhelm, and Bryant ignored the unauthorized computer usage of others who did not complain of discrimination. Id ¶ 9-11,15,17-18.

28.     The aforementioned allegations, even if true, warrant nothing more than an Improvement Conversation, as suggested in the Employee Handbook. Ms. Bryant should have at least lowered the write up to a Second Step Action, and even that would have been unjust in that plaintiff should not have been written up at all. Instead Ms. Bryant did neither and supported management's decision to give plaintiff a Third Step Action. Ms. Bryant in her determination stated "I support your manager's decision to issue you a DMD" and "Your request for your DMD to be rescinded or lowered to an informal conversation is denied." *See* Bryant Determination attached at page 2, ¶ 4, as **Exhibit C**.

29.     The adverse employment action of 10-5-17 that plaintiff was subjected to following the protected activity was result of the collaborative effort of Director of Security Mark Wilhelm, Human Resources Loren Margott, and Employee Relations Carla Bryant.

30.     Plaintiff, then on 3-2-18, was pulled off duty by Wilhelm and was "suspended for three days pending an investigation." Plaintiff, shocked and dismayed, inquired as to what was the reason he was receiving the suspension. Wilhelm simply repeated the mantra

that plaintiff was "suspended pending an investigation." Wilhelm then ordered plaintiff to turn in his department issued radio and proceeded to suspend plaintiff for three days without pay. Plaintiff was terminated four days later on 3-6-18. Kachmar 109 F.3d 173, 177 (3d Cir. 1997).

31.     Plaintiff, following the protected activity, was subjected to a barrage of disciplinary actions including: three levels of disciplinary action *plus* an undocumented three day suspension. This barrage also includes defendant skipping a level of progressive discipline closely following the protected activity to set plaintiff up for the termination. A pattern of antagonism is gleaned from looking at the record as a whole and been found where an employee is subject to a "constant barrage of written and verbal warnings" Robinson v. Se. Pa. Transp. Authority, 982 F.2d 892, 896 (3rd Cir. 1993).

32.     Significantly, the disciplinary write-ups following the protected activity were baseless, unsubstantiated, and trivial in nature. Young No. 11-5518, 2013 WL 526814, at *4 (E.D. Pa Feb 13, 2013).

**Defendant Cannot Establish Legitimate Business Reasons For Terminating Plaintiff**

33.     Finally, there is the termination document of 3-6-18. This disciplinary action is so frivolous that it gives a description of events that consists of two sentences. The write-up states "On Thursday, March 1, 2018 you failed to assist visitors who you acknowledged seeing at the Lifter doors. When questioned by a Senior Leader about why you failed to assist the patients and why you were seated in the Lifter Lobby you stated 'So inquiring minds want to know.'" The brevity of the termination document is clear evidence that defendant had no legitimate basis to terminate plaintiff. *See* "REASON FOR DISCHARGE" attached as **Exhibit F**.

## As to the Lifter doors

34.    This is an employee's entrance that has a card reader in which employees are to swipe their ID badge in order to gain entrance.  For visitors, there is an intercom system with a button that they are to press, which allows them to talk to someone and be screened.  This is the protocol for visitors who want to gain access through that entrance.

35.    Significantly, there is a station by these Lifter doors that has a button under the desk that security used to press, which would open the Lifter doors for visitors to enter. Supervision ordered that security is no longer allowed to sit at this station and press the button allowing visitors gain access.  Plaintiff was merely doing as he was instructed by supervision. Young No. 11-5518, 2013 WL 526814, at *4 (E.D. Pa Feb 13, 2013).

36.    Plaintiff committed absolutely no violation whatsoever.  Therefore, defendant's allegation that plaintiff "failed to assist visitors" when it was their instructions not do so, as it relates to the Lifter entrance is baseless.  Furthermore, not only is the allegation factually incorrect, terminating plaintiff for not opening a door for a visitor, when there is a system in place for them to gain access, is as trivial a matter as one could fathom.  Id.

37.    To further evidence the frivolousness of this write up, this particular post (post #22) where the Lifter doors are is not even a regularly manned post.  This post is only assigned when there are extra security personnel.  Even then, the officer assigned to this post is instructed to do regular patrols of designated areas within the hospital and to assist with other hospital emergencies.  Therefore, the overwhelming majority of the time, security would not even be there to "assist visitors."  Id.

11

<u>As to Plaintiff's comment to the Senior Leader</u>

38.     A woman, who Plaintiff did not know, came over and began questioning Plaintiff about the visitors who were trying to gain access, and why Plaintiff was posted in the lobby as opposed to being behind the desk.  Plaintiff (smiling) said, "so inquiring minds want to know.  May I ask who you are?"  Plaintiff was friendly and diplomatic.  She (Ruth Lefton), then stated that she was the CEO of the hospital.  Plaintiff then introduced his self and then shook her hand.  <u>Id</u>.

39.     Significantly, as the CEO of the hospital, Ms. Lefton knew or should have known that this was an employee's entrance and that plaintiff was not permitted to let visitors in through that entrance.  Ms. Lefton should have also known that there was an intercom system in place for visitors who want to gain entrance.  It is unclear why Ms. Lefton even questioned plaintiff regarding this matter.  <u>Id</u>.

40.     Later that day, while in the cafeteria, Ms. Lefton walked over and apologized to Plaintiff for not introducing herself, clearly acknowledging her wrongdoing.  Plaintiff responded saying "That's okay, it's a pleasure to meet you once again."  Plaintiff was respectful and cordial at all times.  Plaintiff made Wilhelm aware of this second conversation with Ms. Lefton as well as the first one.  <u>Id</u>.

41.     It is unclear, once again, why Ms. Lefton felt the need to make mention of this minutia.  Nevertheless, she certainly did not order Wilhelm to fire plaintiff.  This was Wilhelm's objective, and through his own retaliatory animus, took full advantage of it by generating this baseless termination document.  <u>Id</u>.

42.     Plaintiff acknowledges that, to his detriment, he did not know who Ms. Lefton was, however there is certainly nothing to suggest that he violated any "Standard of Conduct" nor that he committed any other wrongdoing. Id.

43.     Combine the baseless termination document of 3-6-18, the three day suspension of 3-2-18, with the trumped-up write up of 10-5-18, in which the defendant skipped over a level of progressive discipline to set up the unlawful discharge, and you have a clear "pattern of antagonism" following plaintiff's protected activity. Kachmar 109 F.3d 173, 177 (3d Cir. 1997).

44.     Defendant perpetrated this unlawful employment act of retaliation with deliberate malice, and willful intent against plaintiff for engaging in the protected activity. Id.

## The Court Must Accept Plaintiff's Allegations As True

45.     The Court is mindful that in determining the sufficiency of a pro se complaint, the Court of Appeals for the Third Circuit has instructed district courts to read pro se complaints liberally, and must construe the allegations in favor of the plaintiff. Haines v. Kerner, 404 U.S. 519, 520-21, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972); United States v. Day, 969 F.2d 39,42 (3d Cir. 1992). Thus, the Court "will accept as true all of the allegations in the Complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to [Plaintiff]." Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997).

46.     Plaintiff takes full advantage of this binding authority. Plaintiff has clearly demonstrated a conclusion of retaliatory animus that can be regarded as logical, and since "the Court will accept as true all of the allegations in the Complaint and all reasonable inferences that can be drawn therefrom" then the Court must rule in his favor. Id.

13

**Count 2**

**Promissory Estoppel//Detrimental Reliance**

47.    Paragraphs 1 through 46 are incorporated herein by reference as though set forth in full.

48.    "Promissory estoppel and detrimental reliance are treated interchangeably by Pennsylvania Courts" CMR D.N. Corp. v. City of Philadelphia, 703 F.3d 612, 634 n.15 (3d Cir. 2013) (citing Rinehimer v. Luzerne Cnyt. Cmty. Coll., 539 A.2d 1298, 1306 (Pa. Super. Ct. 1988).

**Factual Background**

49.    Plaintiff commenced his employment with Einstein (4-4-16) by accepting a 16 hour part-time offer of employment that consisted of him working every weekend, both Saturday and Sunday.  This caused great conflict with Plaintiff's then current full-time employer, Allied Universal ("Allied") in that working weekends with Allied was mandatory.  Plaintiff worked security full-time for Allied at their Temple University Account for about two years (five years in total with Allied).  Plaintiff informed Allied that he was no longer available to work weekends due to accepting the new weekend job offer with the Einstein.  Plaintiff, however still wished to work the weekday, Monday, Wednesday, and Friday portion of his schedule for Allied.  The Account Manager for Allied denied Plaintiff's request to work just the week day part of his schedule, and subsequently removed Plaintiff from the account for no longer being available to work weekends.  Plaintiff filed a grievance with his Union in opposition to being removed from the account and in an attempt to salvage the weekday portion of his schedule.  The Union upheld Allied's decision to remove plaintiff from the account for no longer being available to work weekends stating in their  Determination "Because of a better weekend

14

opportunity, you informed your Employer you were no longer available to work Saturday and

Sunday and you asked them to accommodate your schedule, which they denied." "Allied then

proceeded to take you off the schedule completely." *See* Union Determination at lines 7-10,

12,13 attached as **Exhibit G**.

### Plaintiff Is Clearly Able To Establish A Prima Facie Case Of Promissory Estoppel/Detrimental Reliance.

50.     The elements of a claim for promissory estoppel and detrimental reliance

are: (1) a promise made by the defendant to the plaintiff, which the defendant expected would

induce action on the part of the plaintiff; (2) which does induce the expected action by the

plaintiff; and (3) "injustice can only be avoided by enforcing the promise." C&K Petroleum

Prods., Inc. v. Equibank, 839 F.2d 188, 192 (3d Cir. 1988) (citations omitted).

51.     Plaintiff, for the reasons stated, was not permitted to work for both Allied

and Einstein simultaneously.  However, Einstein paid significantly more than Allied.  Also,

Wilhelm during the pre-hire, interview process promised plaintiff full-time employment with

Einstein, which he received, upon completion of his probationary period.  Therefore, plaintiff left

his job with Allied reliant on the promise of full-time employment, and the long term

compensation with Einstein that would outweigh the detriment of losing his job with Allied.  Id.

52.     To further evidence that plaintiff gave up his job with Allied reliant on

defendant's promise of full time employment, plaintiff's last day of employment with Allied was

4-3-16.  Plaintiff's first day of employment with Einstein was the very next day on 4-4-16.  *See*

16 hr. part-time, weekend Offer Letter attached as **Exhibit H**.

53.     Plaintiff was further induced in that on January 6, 2017 he moved and obtained a new apartment (5611 Chew Ave. Philadelphia, PA 19138) for the sole purpose of being within walking distance of the hospital. Id.

54.     Significantly, the third prong and the "injustice" in this *prima facie* case of promissory estoppel/detrimental reliance is satisfied in that after plaintiff left his previous job, relocated, and dedicated himself to a career at Einstein, defendant then systematically and deliberately terminated him without just cause. Id.

## Count 3

## **Breach of Implied Contract**

A. Substantial Hardship

55.     Paragraphs 1 through 54 are incorporated herein by reference as though set forth in full.

56.     Not only did defendant induce plaintiff to leave his current job with the promise of full-time employment with Einstein, plaintiff had to endure a significant hardship as a result thereof. For example, the initial 16 hour part-time offer of employment was outside of Philadelphia at their Elkins Park location. Plaintiff informed Wilhelm that he was only interested in full-time employment at the main hospital (in Philadelphia) and that he did not have reliable transportation to travel outside of Philadelphia to their Elkins Park location. However, defendant was in need of weekend coverage at their Elkins Park location, and plaintiff was promised a full-time position at the main hospital upon completion of his probationary period. Therefore, plaintiff accepted the part-time job opportunity and the accompanying hardship reliant on that promise. Thus, when an employer induces the plaintiff to leave his job with promises of future opportunity, *and the plaintiff undergoes significant hardship in response to the promise,*

the jury has found that an implied contract was created, and that the employer breached its

contractual obligations.  Cashdollar v. Mercy Hospital of Pittsburg, 460 Pa. Super. 606, 595 A.2d

70 (1991).

      57.    Plaintiff suffered great hardship in traveling both to and from work to the

Elkins Park location.  Plaintiff, during his probationary period was late once, and only once, due

to his dependency on a bus that runs once and hour and was unreliable.  Therefore, Wilhelm

ordered plaintiff to report to work "one hour early" to ensure plaintiff's ability to clock in on

time regardless of bus service.  Plaintiff complied with Wilhelm's demand and reported to work

one hour early, for which he was not paid.  Plaintiff continued to report to work one hour early

throughout the duration of his employment at Elkins Park. Id.

      58.    The commute from Elkins Park upon completion of his shift (10:30 p.m.)

caused an even greater hardship in that there was no public transportation at all during the night

hours to take plaintiff into the city where he resided.  Therefore, Plaintiff had to endure both

traveling and financial hardship of paying for cabs and ubers to take him into the city where he

would still have to take public transportation to take him to his place of residence. Id.

      59.    Significantly, Wilhelm promised plaintiff that upon completion of his

probationary period that he would be promoted to a full-time position in which he would work

exclusively at the main hospital.  Plaintiff did receive and full-time employment upon

completion of his probationary period. However, Einstein still had not obtained weekend

coverage at their Elkins Park location.  Thus, the Einstein delayed their promise that plaintiff

would work exclusively at the main, and created a "hybrid" schedule that no other employee in

the Department had to work in order to get 40 hours.  Plaintiff's full-time schedule consisted of

him working 24 hours at the main hospital on 1st shift (6 a.m. to 2:30 p.m.) and 16 hours on the

weekends at Elkins Park on 2nd shift (2:00 p.m. to 10:30 p.m.). Plaintiff was finally on 11-24-16

given his full-time offer of employment to work exclusively at the main hospital. Therefore,

Plaintiff had to endure the continued hardship of traveling both to and from Elkins Park for an

additional four months, even after he passed probation and was working full-time, until

defendant finally got the part-time coverage that they needed at that location. Id.

60. Plaintiff's hardship claims are, in and of itself, insufficient to establish that

an implied contract was created. However, it is the cumulative, totality of the circumstances

as a whole, upon which plaintiff relies. That plaintiff was (a) forced to report to work "one

hour early" for which he was not paid. (b) induced to endure both a financial and travel

hardship at the end of his shift. (c) subjected to a "hybrid" schedule that extended plaintiff's

hardship beyond the agreed upon date. (d) induced to leave his job with the promise of a

future opportunity. Id.

61. Asserted independently, just the irrefutable fact that plaintiff gave up his

job that he worked at for five years to pursue a career at Einstein is enough to warrant serious

consideration that an implied contract had been created. "Courts, in determining whether an

implied contract was created, consider whether the employee had to give up other job

opportunities in order to take the job." Permeter v. Crown Cork & Seal Co., Inc., 38 F. Supp.

2d 372, 379 (E.D. Pa. 1999) (citing Marsh v. Boyle, 530 A.2d 491, 494 (Pa. Super. Ct. 1987).

B. Reasonable Period

62. Pennsylvania Courts will not recognize an implied contract of

employment for an unlimited period of time. Rather, the Pennsylvania courts will only

recognize the creation of an implied contract for a reasonable period of time. See Woods,

677 F. Supp. 2d at 817 ("If sufficient additional consideration is present in a case, a plaintiff

is entitled to protection from being discharged without cause for a reasonable time."). (citing <u>Veno v. Meredith</u>, 515 A.2d 571, 580 n.4 (Pa. Super. Ct. 1986).

63.    Accordingly, in <u>Zysk v. FFE Minerals USA Inc.</u>, 225 F. Supp. 2d 482 (E.D. Pa. 2001) the court held that plaintiff had established an-implied in-fact contract for employment for a reasonable period of time, stating his "two-plus years of employment with defendant more than fulfilled the required reasonable period." Therefore, plaintiff's one year and eleven months length of employment with Einstein certainly falls under the umbrella of a "reasonable period of time." <u>Id</u>.

### Defendant Terminated Plaintiff Without Just Cause.

64.    Plaintiff's termination and relevant circumstances were already articulated in the above referenced matter.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, for the reasons articulated in his complaint, seeks compensatory and punitive damages up to the maximum amount allowed under the applicable law.

Dated on this 6th day May, 2019

Michael Wiggins, Paralegal

19

"EXHIBIT A"



**Einstein**
HEALTHCARE NETWORK

## More than Medicine

September 15, 2017

Michael Wiggins
P.O. Box 59515
Philadelphia, PA 19102

Dear Michael,

This letter is a follow up to our meeting on August 24, 2017 in response to a previously written statement to me on August 17, 2017. In our meeting, and in your written statement you stated that you felt you were being targeted, discriminated against and harassed by your colleagues because you are bi-racial. When I asked you for proof of this, you stated that you were being held to a different standard and that people were making complaints about you to Protective Services leadership. You also insisted that it was a violation of law for employees to go outside of the "Chain of Command" to make complaints. Specifically, you insisted that Officers going to the Department's Assistant Director, and not to their direct Supervisor or Manager was a violation of the law.

Einstein Healthcare Network has an open-door philosophy which allows all members of our workforce to interact with any level of management at any time. Officers are free to contact any level of Management to address concerns, file complaints or make suggestions to better the operations. There should never be a situation where an employee is restricted from reporting outside the "Chain of Command" as it does not correspond with our philosophy and is certainly not a violation of any law.

The fact that members of the Protective Services Department, patients, visitors or other Einstein employees may have made complaints about you is not proof of harassment or discrimination. Nor does the investigation of such complaints provide support or proof of your claim. All complaints are investigated and/or addressed as they arise.

During our meeting, you also cited two incidents that occurred in the past regarding other officers. I have looked into these situations and I feel that both incidents were properly addressed at that time.

Per our agreement, should you feel that you are being harassed or targeted in any way, you should contact me immediately so that an investigation can be conducted. I can be reached at 215-456-6923.

Sincerely,

Loren Margott
Human Resources Service Specialist

Cc: HR file

August 17, 2017

Dear *(Loren Margetti, HR)*

Please allow this letter to serve as my formal complaint of Racial Discrimination and Harassment perpetrated against me by Security Officers Vincent Wilson and Nathaniel Carter. I also raise issue with the incorrect and inappropriate handling of the unlawful employment acts by Assistant Director Mark Wilhelm.

The aforementioned security officers have launched a deliberate and malicious campaign to slander me and undermine my work performance with the upper management of the Security Department, specifically Assistant Director Mark Wilhelm.

For example, approximately one month ago (exact date unknown) I was called to respond to a combative patient on the psychiatric unit of Tower 7. I arrived to the unit with Cpl. Davis, and S/O Wilson, and as we were talking to the woman, she broke away from us, ran across the lobby to the dining area of the ward, and began punching another psychiatric patient in the face. We gave chase. Cpl. Davis and S/O Wilson arrived first, myself just seconds later. Once there, I grabbed the woman by the arm stating "you're detained." I then, along with Cpl. Davis and S/O Wilson assisted taking this woman to the restraint room where we eventually applied 4 point restraints.

I maintain my position that my actions were both justified and warranted in that it took 4 or 5 officers to hold this patient down and eventually apply the restraints.

Afterwards Cpl. Davis pointed out to me that after I yelled out "your detained" an expletive inadvertently followed. Cpl. Davis then had a talk with me stating "I know that this was the heat of the moment," but next time try to exercise a little more restraint. Cpl. Davis then assured me that this would be an "off-the- record counseling" and that it "would not go any further."

S/O Wilson, approximately one month later, took it upon himself to bypass Cpl. Davis' decision, who is of course a supervisor, as well as the other Sergeants on the shift, and go directly to the top of the rank by reporting the incident to Assistant Director Mark Wilhelm.

S/O Wilson had absolutely no right to do that. Furthermore, when doing so he levied a false allegation stating to Mr. Wilhelm that "I (S/O Wiggins) grabbed this woman when she was already under control." This statement is proven false in that it took 4 or 5 officers to hold this woman down while restraints were applied. This woman was clearly NOT under control, during her profanity laced assault on another patient. Moreover, the incident happened about one month ago, and was over, and settled.

S/O Wilson's complaint about me were brought to light on 8-16-17 when Mr. Wilhelm had me report to his office to discuss the past incident. It was during our conversation that it was revealed that S/O Wilson is the one who instigated this matter.

Furthermore, it should be duly noted that S/O Wilson is the last one who should talk about anyone being overly aggressive.

Earlier this year (date unknown) I responded to a domestic dispute in Tower lobby. A complaint was made by a female visitor that her boyfriend took her cell phone and refused to give it back. As I was speaking with the male, informing him of the consequences of stealing someone's belongings on Einstein property, S/O Wilson barged in stating "You gonna give her back the fucking cell phone." S/O Vincent charged in donning black leather gloves, and obvious sign of aggression.

The adult male responded to S/O Wilson's aggression by punching S/O Wilson in the face. A fight then ensued in which I took the assailant down and assisted in detaining him for assaulting one of our officers.

S/O Wilson, afterwards bragged to the entire shift that he "punched" the perpetrated "in face" in retaliation for being struck himself. S/O Wilson because of his unwarranted aggression created an entire may lay in Tower lobby when I was on the verge of de-escalating the situation by persuading the male to simply return the phone.

S/O Wilson's actions were far more egregious than mine, yet he faced absolutely no disciplinary scrutiny, while I am subjected to an investigation over a very minor incident that happened almost a month ago.

I mention this incident NOT to deflect attention from myself, but to point out the disparate treatment of offenses that I am constantly subjected to as a result of officers like S/O Wilson and S/O Carter. I am constantly held to a much more stringent application of the policies than anyone else. I attempted to point that out to Mr. Wilhelm during our meeting, but his closed mindedness and arrogance would not allow me to make the point.

Mr. Wilhelm took S/O Vincent's report about me to its fullest extent, calling for a formal meeting, requesting Lt. Petty's presence, and taking notes. Mr. Wilhelm at the beginning of the meeting assured me that "this is going nowhere." Mr. Wilhelm's overkill for something that was "going nowhere" seemed at bit odd, but nevertheless I was satisfied with the reassurance at that time.

However, during this meeting Mr. Wilhelm introduced a new element. It was at this time that Mr. Wilhelm informed me that about 4 or 5 security officers had come to him with slanderous remarks about me. This changed the course of the meeting.

I requested to know who these employees are that are making these complaints about me behind my back, *so that I may have a fair opportunity to defend myself*. Mr. Wilhelm position was that it didn't matter, because "it's not going anywhere." Mr. Wilhelm misses the point. Whether it's "going anywhere" or not is completely irrelevant to fact that these officers, who are not supervisors, have absolutely no right whatsoever to do that.

Mr. Wilhelm became agitated stating to me "Your whole attitude changed from the time you first came in." Well, of course it did. I was just informed that employees were coming to him, about me, behind my back. It was very unreasonable for Mr. Wilhelm to expect me not to have a reaction when just informed of such a thing.

Significantly, Mr. Wilhelm, because I requested to know who these employees were that were doing this reneged on his agreement that this was "not going anywhere" stating to me that "now it's going to HR."

Mr. Wilhelm threatened me with HR action just because I wanted to know what employees were coming to him about me without my knowledge. Mr. Wilhelm's attitude suggests that one is to sit quietly, and not oppose anything he says whether it's wrong or not.

As stated, these security officers are NOT supervisors and have absolutely no right or authority to circumvent the chain of command of supervisors by going directly to the Assistant Director and levying false and baseless allegations against me in an attempt to sabotage my employment.

S/O Carter is another one who has repeatedly from the start of my employment, not only gone to all levels of supervision against, but has sought to rally, incite, and inspire others to do the same. During the start of my employment I had a meeting with Lt. Petty regarding S/O Carter's frivolous allegations about me not responding promptly and being unwilling to assist other officers in times of hostile situations.

However, since then, I have established a track record of both responding promptly and willing to step in during dangerous situation. S/O Carter's initial characterization of me looks frivolous at this point – yet he continues in other areas.

S/O Carter has started a false misconception that I have a problem getting along with other co-workers. This is untrue. I get along well with many of my co-workers, and for those that I do not, I remain cordial, respectful, and fully available to them when, and if, they ever need my assistance.

This is discrimination and harassment in its purest form, and I will continue to assert my right to work in a harassment free environment.

Respectfully submitted,


Michael Wiggins

# "EXHIBIT B"

# MEMORANDUM
## PERFORMANCE ACCOUNTABILITY

| | |
|---|---|
| **TO:** | MICHAEL WIGGINS |
| **FROM:** | DIRECTOR MARK WILHELM |
| **SUBJECT:** | DECISION MAKING DAY |
| **DATE:** | 10/05/17 |
| **CC:** | HR FILE |

Your performance continues to not meet expectation. Specifically, on two (2) separate occasions you were doing non-work-related activities while on duty causing an unsafe and unwelcoming environment to staff, patients and visitors.

We have previously discussed your performance on:

- First Step Action issued March 9, 2017

At this time, I believe you need to consider your commitment to continued employment with Einstein. You will go home today, and remain out of work on October 5, 2017, with pay, to reflect on whether you wish to remain employed with Einstein. Should you decide to continue your employment with Einstein, you must do the following:

- Make a commitment to fully acceptable performance in every area of your job, which includes, but is not limited to, your performance.

- Put your commitment to continued employment with Einstein in writing. This commitment should be specific regarding how you will resolve your performance in the future. This commitment from you will be included with this memo in your HR file. Failure to abide by this commitment may result in the termination of your employment.

Please return to work on October 06, 2017 and report to my office at 9:00 am *8:30 am* to review your commitment to continued employment. Please understand that this is the final step of Einstein's Performance Accountability Approach and that further deviation from Einstein's performance expectations or Code of Conduct may result in the termination of your employment.

Wiggins

Page 2

I understand that this memo is the final formal step of Einstein's Performance Accountability Approach.

| | |
|---|---|
| Employee Signature | 10 -5 -17 <br> Date |
| Department Head Signature | 10-5-17 <br> Date |
| HR Service Specialist Signature | 10/4/17 <br> Date |

# "EXHIBIT C"



**More than Medicine**

February 15, 2018

Michael Wiggins
P.O. Box 59515
Philadelphia, PA 19120

Dear Mr. Wiggins,

On February 2, 2018, you participated in a grievance hearing with Employee Relations in response to your Decision Making Day (DMD) issued for performance and performing non-work related activities while on duty. At our meeting, you asked for your DMD to be rescinded and lowered to an improvement conversation.

During our meeting, you stated you disagreed with your supervisor, Mark Wilhelm's decision to give you a Decision Making Day (DMD). You explained you were issued a DMD for being rude to a patient and playing video games while on duty. You said the reason you believe this performance accountability action is inappropriate is because you deny that your actions were inappropriate when you were interacting with a patient. You said the only allegation that you will acknowledge is that you were playing Asteroids and accessing your personal email and Facebook account. You said that despite this, it is your belief that your supervisor should not have started the discipline process at the level of a DMD. You explained that it is your understanding that Einstein's Performance Accountability policy requires management to follow each progressive step outlined before issuing the next level of discipline. You said that prior to this incident, you were never given the opportunity to correct your behavior by being issued a First or Second Step Action. You explained that since you were not provided with the opportunity to receive progressive discipline; you believe the only appropriate remedy to this matter is to lower your DMD to an informal conversation which is the lowest level of Einstein's Performance Accountability process.

Mr. Wilhelm stated that on August 23, 2017, an Einstein employee reported that she witnessed you behave in a rude manner when interacting with a patient she was assisting. Mr. Wilhelm said the employee stated that both she and a patient approached the security desk to inquiry about the whereabouts of the Moss registration staff. In response to their question, you stated that "the staff went to lunch." The employee also reported the patient then asked you, "where did they all go?" To which you answered, "Well everybody gotta eat". The employee stated afterward that both she and the patient were dismayed by both your comments and the rude mannerisms you displayed. Mr. Wilhelm said that after receiving this report, he confirmed the witnesses account of this incident by reviewing surveillance video of the interaction. Mr. Wilhelm said while reviewing video he noticed that for much of the time that you were on your post, you were playing video games and accessing what appeared to be your Facebook account.

In addition to this incident, on September 27,2017 Mr. Wilhelm was advised that there was an issue with the ATM in the Moss Building's lobby. Mr. Wilhelm said that while investigating this incident he found you were on duty at the security desk at the time of this incident. Mr. Wilhelm said when he asked you about the incident and if you were aware that the ATM had been left open, you stated, "No". You also said that you didn't notice the ATM vendor had come to service the machine and had left it open. Mr. Wilhelm said that when he asked if your knowledge was limited because you were playing video games or accessing social media; you responded by stating you may have accessed your Facebook account. Then you quickly recanted this statement and said you were not playing video games or on your social media. Mr. Wilhelm said in response to your statement, he advised you that he had personally observed you doing so. Mr. Wilhelm said after hearing his comment, you again changed your statement; admitting you had been playing video games, checking your email and viewing your social media account during the incident.

After speaking with you about this incident, Mr. Wilhelm consulted with his Human Resources Service Specialist, Loren Margot. Together they met with met with you to discuss Mr. Wilhelm's concerns about your personal computer usage and the patient complaint he had received.  Mr. Wilhelm said that when he asked you about your patient interaction with patient, you denied the that you behaved in a rude manner as reported.  You expressed you felt it was appropriate for you to tell the patient that, "Everybody gotta eat." Mr. Wilhelm said that during this meeting you also acknowledged that you play video games, check personal email, and access your social media for approximately two-hours per day while on duty.

At the grievance, Mr. Wilhelm explained that these incidents were not the first issues he has had with your performance. On March 6, 2017 he issued you a First Step Action for playing video games on the computer at Germantown CRC, and for failing to properly identify an EHN employee prior to allowing her to access to the Klein Building.   Mr. Wilhelm said that he has also informally counseled you about the manner in which you spoke to a Tower 7 Behavioral Health patient. Mr. Wilhelm said that in response to your performance issues he felt it was appropriate to give you a DMD.

After our meeting I reviewed your statements as well as those presented by your supervisor. Additionally, I reviewed the statement that you submitted prior to our meeting. I am aware that you are concerned that your supervisor is not complying with Einstein's Performance Accountability Policy by giving you a DMD. However, as I stated during our meeting, Einstein's Performance Accountability Policy: HR133.1 (Section B page 6) provides that while Einstein's policy is intended to be progressive, managers have discretion to initiate any step in the formal alignment process. As such, when I reviewed the information that was presented, I find that you did use Einstein's computer for non-work related activities and I also believe that you were inappropriate with the manner in which you spoke with the patient. It is for these reasons that I support your manager's decision to issue you a DMD in response to your performance and performing non-work related activities.   Your request for your DMD to be rescinded or lowered to an informal conversation is denied.

Please be advised that this response does not exhaust your rights under Einstein's grievance procedure.  If you wish to file a further appeal, please contact Employee Relations at (215) 456-6920 within 10 days of the date of this letter.

Sincerely,

Carla Bryant
Employee Relations Specialist

"EXHIBIT D"

ALBERT EINSTEIN HEALTHCARE NETWORK

| No. HR133.1 | **POLICY AND PROCEDURE** | No.    HR133.2 |
|---|---|---|
| Date: 3/7/2011 | **MANUAL** | Eff. Date: 1/7/2015 |
| | | Page:    6 of 12 |

DEPARTMENT: Human Resources          SUBJECT: Performance
                                                                      Accountability Program

---

    b.  The manager must advise the employee that s/he is receiving a First Step
        Action, the first formal alignment step of Einstein's Performance
        Accountability Program.

    c.  After the First Step meeting, the manager will document the meeting with
        a written summary of the meeting.  This written summary will be given to
        the employee and will normally result in a follow-up meeting.

    d.  The summary will describe the performance issues, the commitments of
        change that were agreed upon by the employee, as well as any
        management commitments.  This document will also include the
        employee's PSP, if appropriate.

    e.  The summary of the First Step meeting will be included in an employee's
        Human Resources file and remain active for consideration for one (1) year
        from the date it was given to the employee.

    f.  When an employee fails to correct a performance problem addressed in
        the First Step Action or exhibits behavior that fails to meet Einstein's
        Standards of Behavior and/or expectations consistent with the same Code
        of Conduct element, the manager will initiate further action under
        Einstein's Performance Accountability Program.

        In cases where an employee may exhibit a performance problem or exhibit
        inappropriate behaviors within a different element of the Code of Conduct,
        managers may issue a second First Step Action.  Employees should not
        have more than three active First Step Actions in their personnel file.



        While Einstein's Performance Accountability Program is intended to be
        progressive, managers have the discretion to initiate any step in formal
        alignment steps, including termination of employment, based on the
        previous communications with the employee and/or the severity of the
        situation.

  2.  *Second Step Action*

      If an employee continues not to meet performance expectations, is
      unsuccessful in showing sustained improvement and/or continues not to
      follow policies and procedures, the manager will typically address such issues

# "EXHIBIT E"

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

MICHAEL WIGGINS,     :
          :
   Plaintiff     :  Appeal Hearing Affidavit
          :
vs.          :
          :
          :
EINSTEIN HOSPITAL, et al.   :
          :
   Defendant    :
          :

### Appeal Hearing Affidavit of Michael Wiggins

I, Michael Wiggins, do swear of affirm:

1. I, Michael Wiggins ("Plaintiff"), from 4-4-16 through 3-6-18, worked as a Protection Officer at Einstein Medical Center at 5501 Old York Rd. Philadelphia, Pennsylvania 19144.

2. Plaintiff, on 2-2-18, attended an Appeal Hearing before Employee Relations, Carla Bryant in which he appealed a Third Step Disciplinary Action of 10-5-17 also known as a Decision Making Day ("DMD").

3. Director of Security, Mark Wilhelm and Human Resources, Loren Margott were also in attendance.

4. Carla Bryant initiated the Hearing by stating "You are not allowed to record or take notes of this Hearing."

5. An employer is not obligated to give consent to an employee recording a Hearing, and it is customary for them not to do so. However, disallowing an employee from taking notes of their own Hearing is highly suggestive and pretextual.

6. Nevertheless, plaintiff made a mental notation of key testimony of the Hearing and then notated such testimony immediately upon conclusion of the Hearing to ensure accuracy while his recollection of testimony was fresh.

1

7. Ms. Bryant's support of management's unlawful retaliation during the Hearing was clearly evident.

8. Ms. Bryant, during the Hearing, repeatedly interrupted plaintiff, questioned the validity of his testimony, and cross examined plaintiff, while allowing management to speak freely without opposition.

9. Plaintiff, among other issues, opposed the disparate treatment that he received regarding his alleged computer usage.

10. For example HR's Margott, when he issued plaintiff the write up of 10-5-17, cited very specific time frames regarding plaintiff's alleged computer usage that he acknowledged reviewing.

11. Yet, Margott at the Hearing before Carla Bryant changed his story stating that he "never actually conducted a review" of plaintiff's computer usage, but that he only "threatened" plaintiff with such action.

12. Plaintiff, as a result, turned to Employee Relations Carla Bryant for intervention restating his position that unauthorized computer usage is extremely common within the Department and an accepted employment practice.

13. Carla Bryant averted the issue by stating "What proof do you have? It's up to you to bring proof."

14. Plaintiff responded by stating "You have the proof. I have no way of accessing another employee's computer usage. Only you (management) have the ability to do that."

15. Ms. Bryant failed and refused to investigate plaintiff's claim, and held plaintiff to a standard of scrutiny unlike any other employee in the Department.

16. Director of Security, Mark Wilhelm, never, at any time, opposed or refuted plaintiff's claim that the majority of the Department engages in unauthorized computer usage.

17. Human Resources, never at any time, opposed or refuted plaintiff's claim that the majority of the Department engages in unauthorized computer usage.

18. Plaintiff, who complained of discrimination, was the only employee within the Department, during the time of his employment, who was written up for unauthorized computer usage.

I SWEAR OR AFFIRM THAT THE ABOVE AND FOREGOING REPRESENTATIONS ARE
TRUE AND CORRECT TO THE BEST OF MY INFORMATION, KNOWLEDGE, AND
BELIEF.

May 14, 2019

Date                                              Michael Wiggins

STATE OF PENNSYLVANIA
COUNTY OF PHILADELPHIA

Michael Wiggins

I, the undersigned Notary Public, do hereby affirm that ~~John Doe~~ personally appeared before me
on the _14_ day of May 2019, and signed the above Affidavit as his free and voluntary act and
deed.

Commonwealth of Pennsylvania
NOTARIAL SEAL
Ricardo A Baptiste, Notary Public
Philadelphia City, Philadelphia County
My Commission Expires May 12, 2021

Notary Public

3

"EXHIBIT F"

| DISCHARGE DOCUMENT | EINSTEIN HEALTHCARE NETWORK | DATE 3-6-18 |
|---|---|---|

| EMPLOYEE NAME: Michael Wiggins | DEPARTMENT: Protective Services | Officer |
|---|---|---|

**EMPLOYEE NUMER:**

44372

**PERFORMANCE ACCOUNTABILITY HISTORY:**

1ᵗ Step Action 3-09-17 Performance
Decision Making Day Action 10--05-17 Performance/Behavior

**REASON FOR DISCHARGE:**

On Thursday, March 01, 2018 you and failed to assist visitors who you acknowledged seeing at the Lifter doors. When questioned by a Senior Leader about why you failed to assist the patients and why you were seated in the Lifter Lobby you stated "So inquiring minds want to know".

Your behavior and failure to assist patients/visitors is not in keeping with the Standards of Behavior, Einstein's Code of Conduct, Protective Services and EHN Policies and Procedure or what is expected of a Protective Services Officer. Therefore, your employment is terminated effective immediately.

| Supervisor's Signature: | Date: 3-7-18 | *Employee's Signature: | Date: 3-7-18 |
|---|---|---|---|
| Department Head Signature: | Date: 3-7-18 | Authorized Human Resources Signature: | Date: 3/6/18 |

*This Discharge has been discussed with me. My signature does not necessarily signify agreement with this document.
(Please see grievance procedure)

1/26/2009

"EXHIBIT G"



**32BJ**

**SEIU**
**Stronger Together**

SERVICE EMPLOYEES
INTERNATIONAL UNION
CTW, CLC

**Local 32BJ**
**Headquarters**
25 West 18th Street
New York, NY 10011-1991
212.388.3800

**HÉCTOR J. FIGUEROA**
President

**LARRY ENGELSTEIN**
Executive Vice President

**KYLE BRAGG**
Secretary Treasurer

**LENORE FRIEDLAENDER**
Assistant to the President

**VICE PRESIDENTS**
SHIRLEY ALDEBOL
KEVIN BROWN
JAIME CONTRERAS
ROB HILL
DENIS JOHNSTON
GABE MORGAN
JOHN SANTOS
JOHN THACKER
KURT WESTBY

**Capital Area District**
Washington 202.387.3211
Baltimore    410.244.5970
Virginia     703.845.7760

**Connecticut District**
Hartford    860.560.8674
Stamford    203.602.6615

**District 1201**
215.923.5488

**Hudson Valley District**
914.637.7000

**Florida District**
305.672.7071

**National Conference of**
**Firemen and Oilers**
606-324-3445

**Mid-Atlantic District**
215.226.3600

**Western Pennsylvania District**
412.471.0690

www.seiu32bj.org

June 6, 2016

Mr. Michael Wiggins
P.O. Box 59515
Philadelphia, PA 19102

**RE: suspension/termination**
**Grievance # 9518-16**

Dear Mr. Wiggins,

I have had an opportunity to review your grievance that you filed on April 27, 2016 with regards to a suspension/unjust termination from your worksite at Temple University.   In consultation with the Union's  Attorney, I do not believe that you have a valid grievance.   Based on the information that you provided when we met, I am of the opinion that you voluntarily resigned your full time position rather than being terminated by Allied Barton.  You worked five days per week (Monday, Wednesday, Friday, Saturday and Sunday).  Because of a better weekend opportunity, you informed your Employer you were no longer available to work Saturday and Sunday and you asked them to accommodate your schedule, which they denied.  Because of their denial, you elected to take two additional days of employment from your new Employer, and you notified Allied that you were only available to work on Wednesday's.  Allied then proceeded to take you off the schedule completely.   As I am sure you are aware, the scheduling of employees is typically an inherent right, and unless restricted somehow by the Collective Bargaining Agreement, it remains within Management's discretion.   Article 9 of the CBA sets forth various rights reserved by Management, including the right to "direct and schedule the workforce".

Based on the information above, the Union considers the matter closed.   If you have any questions, please feel free to email me at wmacmaniman@seiu32bj.org

Respectfully yours,

Wayne MacManiman Jr.
PA State Grievance Coordinator
SEIU Local 32BJ

---

Mid Atlantic District
Wayne MacManiman Jr, District Director
Gabe Morgan, Pennsylvania State Director

Philadelphia
42 South 15th Street, Suite 200
Philadelphia, PA 19102
215.226.3600

Wilmington
1000 N. West Street, Suite 1200
Wilmington, DE 19801
302.295.4814

"EXHIBIT H"


**Einstein**
HEALTHCARE NETWORK

March 24, 2016

Michael Allen Wiggins
4717 Leiper Street
Philadelphia, Pennsylvania 19124

Dear Michael:

Congratulations and welcome to Einstein Healthcare Network! I'm delighted to extend you an offer of employment* for the position of Protective Services Officer - Elkins Park. Thank you for choosing to become part of the Einstein Team.

I'm including important information in this letter to make sure that your Einstein employment begins smoothly. Please read this letter fully and carefully. Call me if you have any questions or concerns.

**Below is a summary of your offer details:**

- Your start date is 4/4/2016
- New Employee Orientation begins at 8:00 am on 4/4/2016 and will be held in the Gouley Auditorium, located in the Braemer Building. Orientation will last a full day. That day we provide free parking on the 6th and 7th floors of the Korman Parking Garage, which is adjacent to the main entrance of the Einstein Medical Center. The ticket which you receive upon entering will be validated at New Employee Orientation.
- Your rate of pay will be $15.00 per hour earned and paid bi-weekly
- You are scheduled for 16 bi-weekly evening shift hours
- Weekend/Holiday Requirement: Yes, per department's policy
- You must show proof of your Act 235 Certification and valid driver's license prior to your start date. If you do not currently have a 235 certification you are required to receive such a certification within six (6) months of your first day of employment
- Your introductory period will be 3 months
- This offer is contingent upon passing any required skills testing applicable to the position
- Medical, prescription drug, dental, and vision benefits will be effective on the first of the month after 60 days of employment. Please enroll immediately. Your deadline to enroll is the last day of the month in which you become eligible. To enroll your spouse or dependent children, you must provide proof of dependent status, including:
  - Marriage certificate for your spouse
  - Birth certificate, proof of adoption or court order for your dependent children
  - Additional documentation may be required for stepchildren
  - Please bring these documents during your onboarding visit. There are other documents required for coverage for domestic partners. Please contact me for this information, if needed

**Benefits**
Einstein is pleased to offer a comprehensive and competitive benefits program, for eligible employees. We will explain our comprehensive benefits program to you more fully in our New Employee Orientation.

**Physical Examination**
To work at Einstein Healthcare Network, you must successfully pass a physical examination. The examination will consist of screening for drugs and tuberculosis as well as a verification of immunity to Rubeola (Measles), Rubella (German Measles), Mumps and Varicella (Chicken Pox). You may be required to have a vaccination if you do not show immunity to these diseases. By now, your recruiter should have assisted you in scheduling this appointment. If your appointment has not been made, please contact your recruiter immediately. You must have had your initial appointment at least ten business days prior to your start date to ensure physical clearance for working at Einstein.

Einstein Healthcare Network is committed to providing a healthy and safe environment for our employees and patients. That is why we have a universal flu vaccination policy, which requires all employees to be vaccinated against the flu every year or participate in Einstein's comprehensive, confidential accommodation process.

**Human Resources Requirements**
Following your physical examination, you will need to go to the Human Resources Offices to complete required new hire paperwork and to provide documentation of education and professional credentials. The Human Resources and Recruiting offices are located in the Sheerr Building at the corner of 11th & Tabor Roads. If for any reason you will not be able to go to HR following your physical, please call your Recruiter to schedule an appointment.

Please bring the following to Human Resources to begin your new hire employment processing:
- Proper identification to complete your I-9 Employment Eligibility Verification Form including photo (acceptable forms can be viewed here) http://www.uscis.gov/sites/default/files/files/form/i-9.pdf
- Your offer letter

The Recruitment & Placement Center will need to collect the following credentials and/or licenses pertaining to your position including but not limited to the following:
- Professional license (Nursing, Pharmacist, Technologist, CNA, EMT, etc)
- CPR Card
- ACLS/BCLS
- Diplomas - Associate's, Bachelor's, Master's, trade/professional school, etc.
- Driver's license

If your position requires professional licensure, we require you to provide us with an original license for us to keep for our records. We cannot accept a photocopy of your license and will need the original that you obtain from the state.

**Introductory Period**
You will have an introductory period in your new position and will receive a performance evaluation when your introduction ends. After your initial introduction period, your annual performance evaluation and salary increases will be handled under Einstein policies.

**Sign and Return this Letter**
Please indicate your acceptance by signing and returning a copy of this letter to me. You may fax a signed copy of your letter to me at 215-663-5815. All offers of employment are valid for only a period of 7 days beginning with the day after the offer letter is dated. The Human Resources Department must receive written acceptance by 5:00 pm on the 7th day. Your acceptance will not in any way modify or limit the employment at-will relationship between you and Einstein.

The Human Resources Department is located on the ground floor of Einstein at Elkins Park.

I look forward to your acceptance of this offer and welcome you to Einstein Healthcare Network! As your Human Resources Service Specialist, I am here to support you during your transition to the Einstein team. Once again, please do not hesitate to contact me for assistance at any time prior to your start date or at any time during your employment with Einstein. I can be reached at 215-663-6202, or by email at Wilson04@einstein.edu.

Sincerely,

Amy Wilson
Human Resources Service Specialist

*All offers of employment are contingent upon successfully passing the physical assessment performed by LiveWell Employee Health, all completed references, verification of required credentials, an Officer Inspector General (OIG) clearance for insurance fraud and criminal clearances (and child abuse clearances) as required.

Accepted: _____    Date: _____

Enclosures

CC: Anthony Martin
Employee File